FAULKNER et al. v. BABER et al.

No. 873.

Court of Civil Appeals of Texas. Eastland.

July 3, 1931.

Rehearing Denied Sept. 18, 1931.

Oxford & McMillan, of Stephenville, and J. G. Harrell, of Breckenridge, for appellants.

J. R. Stubblefield, of Eastland, for appellees.

FUNDERBURK, J.

Mary B. Baber, joined by her husband, brought this suit for recovery of a 200-acre tract of land in Stephens county, and to cancel a mineral deed to 640 acres of land of which the 200-acre tract was a part, and also to cancel an agreement for the sharing of the proceeds of minerals from said 640-acre tract and other lands. The defendants are R. E. Faulkner and G. F. Faulkner, brothers of plaintiff, Mary B. Baber, and C. M. Faulkner and W. E. Faulkner, nephews—the children of a deceased brother, Daniel Faulkner. Mrs. Marzee Faulkner, Velma Jones, joined by her husband, C. H. Jones, Verda Mae Faulkner, Willie D. Jones, joined by her husband, A. U. Jones, Pauline Hancock, joined by her husband, H. T. Hancock, Clara Faulkner, Lella Faulkner, and Henrietta Faulkner (the last three minors acting by and through their guardian, Mrs. Marzee Faulkner), Mrs. Paralee Moore, joined by her husband, J. B. Moore, and R. J. Moore made themselves parties by intervention, praying that plaintiffs be granted the relief claimed by them. Upon a special verdict of a jury judgment was rendered for the plaintiffs awarding the relief prayed for, from which the defendants have appealed.

Of date September 9, 1916, F. B. Faulkner, then the owner of lands in Stephens and Erath counties, prepared, signed, and acknowledged separate deeds to each of five children, and another deed to two grandchildren, purporting to convey to them different tracts of the land. The deed to Mary B. Baber, one of the children, contained recitals as follows: "And the further consideration that the grantee herein, Mary B. Baber, is to take, (receive and accept) the 200 acres of land hereinafter described as her share of her inheritance in her mother's and my estate; her mother, Rachel Faulkner, being now deceased. And in consideration of the said Mary B. Baber accepting this as her part of said estate, also the further consideration that I, (her father) am to have the free use and benefit of the land hereinafter described and conveyed for and during my natural lifetime without yielding or paying anything therefor, all such rights of use and benefit to cease at the death of the grantor herein and said tract of land herein conveyed to pass in fee simple to said Mary B. Baber, (my daughter.)" Provisions of like effect were in each of the other five deeds. Previously to the date of said deeds, the children of F. B. Faulkner had deeded to him the homestead tract of land in Erath county, in which they inherited the community interest of their mother. This old homestead tract was the one purported to be conveyed by F. B. Faulkner to Newt Faulkner by one of the six deeds above mentioned. Said deeds were kept in the possession of F. B. Faulkner, the grantor, until about April 24, 1924, at which time, he having refused a request of Henry P. Faulkner to have the deed to him delivered, the latter, under pretext of looking at the deeds, surreptitiously extracted them from the private bank box of F. B. Faulkner, wherein they were kept and sent all the deeds to the county clerks of the counties in which the lands were situated, for record. Two brothers, R. E. Faulkner and G. F. Faulkner, defendants herein, were witnesses to the fact that Henry Faulkner took the deeds without the knowledge of F. B. Faulkner. When the latter, on the same day, was informed by G. F. Faulkner that the deeds had been taken and sent for record, he ordered the recall of the deeds and expressed his unwillingness for them to be recorded, assigning as a reason therefor that he might want to sell the land. All parties who had knowledge of the taking of the deeds and of the recall of the same from the county clerks, unless possibly Henry Faulkner, supposed that they had been returned without having been recorded. The deeds sent to the county clerk of Erath county were returned not recorded, but the three deeds sent to Stephens county, including the one naming Mary B. Baber as grantee, were recorded. Henry P. Faulkner died in March, 1925, and the deeds to the Stephens county property were in his box of private papers at that time. F. B. Faulkner died on November 12, 1925, the other deeds being at that time in his private box.

In 1918, F. B. Faulkner executed an oil and gas lease on the south half of the 640 acres in Stephens county, part of which is in controversy herein, for $9,600 and divided the money with the children. The children did not join in the lease.

On March 1, 1920, F. B. Faulkner, by a deed of that date, conveyed to H. P. Faulkner, R. E. Faulkner, G. F. Faulkner, Mrs. Mary B. Baber, and Mrs. Paralee A. Moore, each a one-fifth undivided interest in the oil, gas, and other minerals in 640 acres of land in Stephens county, which included the 200-acre tract herein sued for by plaintiffs. That mineral deed was duly recorded November 5, 1920. By instrument of the same date (i. e., March 1, 1920), the several grantees in said mineral deed executed a general power of attorney to

G. F. Faulkner to convey or lease the minerals. This power of attorney, by express recitation, referred to the land as that "in which we each have an undivided one-fifth interest by virtue of a mineral deed from F. B. Faulkner, our father, of even date with this instrument."

A few days after the death of F. B. Faulkner, all the grantees in the several mentioned deeds, except Henry P. Faulkner, Wylie N. Faulkner, and Daniel Faulkner, met to settle up the estate. Daniel Faulkner and Henry P. Faulkner being dead, their heirs were present. Newt Faulkner had died, leaving no heirs other than the parties to this suit. At that meeting the several deeds (other than the deed to Newt Faulkner) were accepted by the grantees named therein or their heirs. The deeds which had previously never been recorded were thereupon filed for record. Most, if not all, of the grantors, or their heirs, had in fact been in possession of the land long prior to the death of F. B. Faulkner.

Plaintiffs, by their pleading, sought: (1) Recovery of the 200-acre tract of land upon the theory that title was conveyed from F. B. Faulkner to Mary B. Baber by the deed dated September 9, 1916, which deed had been delivered during the lifetime of the grantor and prior to March 1, 1920, the date of the execution of the mineral deed; (2) cancellation of said mineral deed of March 1, 1920, on the ground that the execution thereof by F. B. Faulkner was procured by the fraud of R. E. and G. F. Faulkner, and was void for that reason and because at the time of the execution of said mineral deed, F. B. Faulkner had theretofore parted with his interest in the land by reason of the deeds aforesaid; (3) cancellation of the mineral agreement of November 16, 1925, on two grounds, namely, first, coercion and duress on the part of R. E. and G. F. Faulkner inducing the execution thereof by plaintiffs and the interveners, and, second, the grantors who were married women did not appear before a notary public for the purpose of acknowledging same, and did not acknowledge same, by reason whereof the 200 acres being the separate property and homestead of Mrs. Baber, such instrument was void. The verdict of the jury and judgment of the court sustained all of these contentions.

It is first insisted by appellants that the court erred in admitting in evidence as proof of title the deed dated September 9, 1916, from F. B. Faulkner to Mary B. Baber, over their objection that there was no evidence to show that same had ever been delivered. It seems to be the contention of appellants that, they having specially alleged that said deed was never delivered, there was thereby cast upon appellees the burden of proving such delivery as a prerequisite to the admissibility of the deed in evidence. There is thus presented an interesting question, not settled by any of the authorities cited in the briefs, which we find it unnecessary to determine, since practically the whole question is controlled by our conclusions in reference to appellants' proposition under their twenty-seventh assignment of error, hereinafter stated. If there was evidence to raise an issue for the jury as to the delivery of the deed, the error of the court, if it was error, in admitting the deed in evidence before such evidence of delivery was introduced, would be wholly harmless.

By their proposition under the twenty-seventh assignment of error it is contended by appellants that the court erred in submitting as an issue to the jury the question whether it was the purpose and intention of F. B. Faulkner to deliver said deed to Mary B. Baber himself or by others for the purpose of passing title to her, over the objection that the uncontroverted evidence showed that said deed was never delivered so as to become effective as a conveyance of the land. We find it necessary to consider only whether there was any evidence to raise an issue for the jury concerning the fact of delivery prior to March 1, 1920, when the mineral deed of that date was executed. If, up to that time, there had been no delivery of the deed, then, for want of legal interest in the subject-matter, plaintiffs showed no right to a cancellation of said mineral deed.

Since there can be no contention that there was any direct evidence of a delivery of the deed, it is necessary to consider what facts or circumstances, if any, exist from which the fact of delivery may be inferred. It is undisputed that about September 9, 1916, F. B. Faulkner made, signed, and acknowledged the deed. It is equally undisputed that the manual possession of same was retained by him up to about April 24, 1924. There is no testimony that he ever gave any direction to or made any request of any other person regarding the delivery of the deed.

Mrs. Baber testified that about Christmas, 1919, she, her husband, and family moved onto the place. This was in response to the direction or advice of her father, F. B. Faulkner, as follows: " 'You had better move out on your place; you are not doing any good, and you better move out there and improve it the way you want it and try to get a start; just settle down and be still and a living will grow around you.' He told me to tell John (Herring, the tenant on the place) to move off the place so I could move on * * * have been living on that place ever since, and claimed it as our homestead. * * * Daddy told me to move on it and improve it. * * * When we moved back on the land we improved it by building two good tanks on the place. My father often visited me during his lifetime. * * * He sure did know that I was in possession of the property. * * * He told us to go

ahead and fix it up because it was ours. * * * When I first found out that my father had made these deeds was in 1916; my brother told me about it; he came out there and told me about it."

She further testified that she lived on the place five years, 1904 to 1909, when the place certainly belonged to her father, and that they paid no rent on it. "I did not sign a lease on the place and my husband did not sign it. My father signed a lease on the land and signed it alone. * * * He got nine thousand and six hundred dollars for the lease * * * that was in 1918. Then in 1920 there was a contract for a lease but that lease was not made. He made a mineral deed. * * * Jake, G. E. Faulkner, brought over a power of attorney to lease the land and me and my husband signed it. Yes, we claimed an interest in the land in 1920. I claimed two hundred acres in it; sure I did. My father had deeded it to me before then, *but he was to have the control of it.* (italics ours.) * * * At the time he got the first lease money he kept part of it, and gave us children a thousand dollars. * * * We did not pay the taxes in 1919, 1920, 1921 and 1922 nor 1923. We did pay the taxes for 1924 * * * after father died * * * in 1925. * * * None of us children paid taxes on our places. * * * Yes, Jake visited my house about between the first and fifth of March, 1920; he was there when he brought that power of attorney there. * * * I signed it and acknowledged it * * * in 1915. I think, we signed this deed back to Daddy for the old home place. We sent that deed to Daddy. * * * This deed was for the tract of land that had never been divided * * * that was the property conveyed to my dead brother * * * part of the property conveyed by these six deeds * * * Newt's deed, he got the old home place."

Questioned as to why, after the heirs had in 1915 conveyed the home place to F. B. Faulkner, he thereafter in 1916 deeded it to Newt Faulkner, she said: "I will tell you why; * * * Daddy said he wanted to divide his land and couldn't do it unless we deeded the place back to him; because it was part of Mother's estate; he wanted to divide the land among his children; that is why we signed the deed. That land is still undivided and we own an interest because Newt died without heirs except brothers and sisters."

W. A. Baber testified: "I learned of the fact that in 1916 F. B. Faulkner * * * made several deeds to his different children and grandchildren for respective tracts of land. * * * I first learned about it when Wylie Faulkner came out to stay with us. * * * That was right away after the deeds were made. F. B. Faulkner did not make any statement directly to me about going into possession of this land, only he told me to go over there and stay on the place and improve it just as we wanted to. * * * He told me which piece of land Mrs. Moore should have, and my wife and Mrs. Faulkner, —Henry is dead. I was talking about making an irrigation tank. * * * I did not commence on the tank until after Mr. Faulkner's death. If I remember right, when we were talking about it down there and surveying for this tank * * * was in 1920. * * * It was in 1916 or 1917, something like that when my father-in-law, F. B. Faulkner was with me and we stepped off the land in order to locate the place where I would put the tank. * * * At that time I was not living on the 200 acres where I am living now, and which we claim. * * * I did not pay him any rent after we went on the place in 1919. I never paid any taxes on the land until after his death."

Charlie Cook testified that in 1919 he asked F. B. Faulkner for a loan, which being refused, the latter gave as a reason: "I haven't got it. I have got my business fixed so my children won't have a lawsuit over it after I am gone."

Mrs. Paralee Moore, the eldest daughter of F. B. Faulkner, testified: "I heard about the fact that my father had made me a deed to this 240 acres and had made Henry Faulkner and all the children various deeds. My father told me that he had divided his lands and had made the deeds. He said: 'I have got my land all divided up. The deeds are made *and in the bank.*' That was all he told me. That was in 1919, sitting on the porch down in Erath County. * * * I did not ask him whether he had divided it up equally or not. * * * I was willing to take what he gave me. * * * He just told me incidentally that he had made deeds dividing up his lands among the children and that he had the deeds in the bank. He did not tell me that he was going to get the deed and deliver it to me. He didn't say. * * * I have testified that I didn't know what part of the land or estate was supposed to be deeded to me."

John Herring testified as to a conversation with F. B. Faulkner at a time when the former was a tenant, in which the latter said, "Herring, you will have to move," "And I said, 'What for, Uncle Frank?' He said * * * he had given part of the place to Mrs. Baber."

■■ It is believed that if there was any evidence of facts or circumstances to show a delivery of the deed in question prior to March 1, 1920, it is comprehended in the foregoing, omitting only mere repetitions which add nothing thereto. Does same constitute any evidence of delivery? To properly appraise or interpret this testimony it should

be considered in the light of the admitted or conclusively proven facts. They are, briefly, that in 1918, about two years after the deeds were made, F. B. Faulkner executed a lease of the land as though he were sole owner; he retained a part of the proceeds and gave each of the children $1,000. March 1, 1920, he conveyed to each of five children an undivided one-fifth interest in the oil, gas, and other minerals in the land. At the same time all the grantees executed a power of attorney which expressly recited the making of the said mineral deed. At said time and for four years thereafter all said six deeds dated September 9, 1916, remained in the possession and under the control of the said F. B. Faulkner. No statement or act of the latter was shown by any of the testimony indicating an intent to part with the control of said deeds. On the contrary, when in 1924 they were, without his knowledge, taken from his box by Henry B. Faulkner upon the pretext of looking at them, and sent away for record, he promptly protested, and ordered the recall of the deeds, stating that if he had wanted them recorded he would have had them recorded, and that he might want to sell the land. The transaction by which the deeds were at that time procured by Henry B. Faulkner and filed for record, while its details are mainly dependent upon the testimony of the defendants, is so fully corroborated by disinterested testimony and by record facts, that we think same may be regarded as conclusively proven. One of the interveners corroborated such facts. F. B. Faulkner's widow testified that just after learning that the deeds, without his knowledge had been sent for record, he said, "I am going to get my deeds and put them in the bank and let them stay there." All of the testimony as to statements or acts tending to show the grantor's intention as to the delivery of the deeds repels the inference of a purpose to give them immediate effect as conveyances. It was necessary that there have existed an intention to deliver the deeds and that there be acts tending to show an execution of that intention. Hubbard v. Cox, 76 Tex. 239, 13 S. W. 170. As said by the Supreme Court in Steffian v. Milmo Nat. Bank, 69 Tex. 513, 6 S. W. 823, 824: "To complete a delivery in its legal sense, two elements are also essential. The instrument must not only be placed within the control of the grantee, but this must be done by the grantor with the intention that it shall become operative as a conveyance." Cox v. Payne, 107 Tex. 115, 174 S. W. 817. "It is essential to a valid delivery that there be some act or declaration from which an intention to deliver may be inferred." 18 C. J. 198.

We think the undisputed evidence shows that up to March 1, 1920, there had been no delivery of the deed. What was said by the Supreme Court in McLaughlin v. McManigle, 63 Tex. 553, is very applicable to this: "The deed being found in the grantor's possession was a circumstance tending, unexplained, to negative the fact of delivery to the grantee. It was a fact consistent with the grantor's having made the same in anticipation of a future delivery of it, accordingly as circumstances might require or incline him, but which had never been carried into effect."

In the present situation there is added the indisputable acts of ownership by F. B. Faulkner while the deeds were in his possession, and all the facts and circumstances relied upon to show delivery are just as consistent with the other and different purpose so well stated in the foregoing quotation.

■ The next contention of the appellants that we shall notice is that there was no evidence of fraud upon the part of R. E. and G. F. Faulkner inducing the execution by F. B. Faulkner on March 1, 1920, of said mineral deed. We have read carefully the statement of facts, and the only evidence which it seems to us could be claimed to raise such an issue of fraud is: (1) The parties accused were beneficiaries of the transaction; (2) they lived with or near the grantor and knew of the making of the mineral deed; and (3) four years later they acquiesced in the conduct of a brother of such a nature that it may be inferred that they were morally capable of committing the fraud charged in the particular transaction. The fact of the fraud alleged cannot, we think, be legitimately thus inferred. It cannot be established solely as an inference from the facts of interest, opportunity to commit it, and the fact that on some other and different occasion and at a different time the persons accused of the fraud connived at a fraud equally reprehensible as that charged.

Besides, the whole claim of fraud as invalidating the mineral deed presupposed the ownership by plaintiffs of all the minerals. Our conclusion that there was no delivery of the deed to Mrs. Baber, as already said, has the effect to show that plaintiffs, because of the lack of legal interest in the subject-matter, have no cause of complaint in this respect. We are forced to the conclusion that the court erred in submitting to the jury the question of fraud in procuring the execution of the mineral deed, but that that question should have been treated as one of law.

The issues relative to the mineral agreement dated November 16, 1925, are rendered not of controlling importance because of the disposition of the appeal made necessary by what has already been said. It is perhaps advisable, however, to express our views as to same in view of another trial. Those issues, it may be said, from the standpoint of appellees, are predicated upon the two other issues hereinbefore determined against them, namely, the delivery of the deed of September 9, 1916, and fraud inducing the execution of the mineral deed of March 1, 1920.

We have not undertaken to pass upon and determine whether the undisputed evidence shows that there was no delivery of the deeds of September 9, 1916, after the death of F. B. Faulkner or at some time before his death, but subsequent to March 1, 1920. It is not deemed necessary to do so, in order properly to dispose of the appeal, and the question is so close that we are unwilling to foreclose it now. It is only deemed material to show the real character of the transaction transpiring a few days after the death of F. B. Faulkner in which the various parties accepted the old deeds and executed the agreement as to sharing the minerals in all the lands.

█ Whether the deeds were in fact conveyances of title from the grantor to the several grantees, or whether because of their never having been delivered they only served the purpose in a partition of the estate of F. B. Faulkner by oral agreement to mark and describe the boundaries and identify the several tracts of land, has an important bearing on the effect of a cancellation of the mineral agreement. If the transaction was a partition of a common estate vested in F. B. Faulkner's heirs, then a cancellation of said agreement, which was a material consideration upon which such partition was made, would not result in the reinvestiture in any one of any title or right in the estate. It would simply dissolve the partition and the whole estate would be subject to a repartition. Walling v. Harendt (Tex. Civ. App.) 37 S.W.(2d) 280. On the other hand, if the deeds vested title directly in the grantees, a cancellation of the mineral agreement would have the effect of restoring to certain of the parties, including the defendants R. E. and G. F. Faulkner, one-fifth of the minerals in the Stephens county lands instead of the proceeds from one-sixth in all the lands, and would deprive defendants C. M. and W. E. Faulkner of any interest in minerals except in the land included in their deed. At the same time such cancellation would have the effect of depriving the plaintiffs and interveners of any interest in the minerals in the lands of the defendants R. E. and G. F. Faulkner.

█ We are inclined to the view that plaintiff's petition, at least in the absence of special exception, was sufficient to admit evidence that the plaintiff Mrs. Baber did not appear before the notary public for the purpose of acknowledging the mineral agreement and did not acknowledge same. There was also, we think, some evidence supporting such allegation. Where a married woman, whose acknowledgment of an instrument is essential to its due execution, does not appear before the officer certifying to such acknowledgment for the purpose of acknowledging it, she may impeach such certificate, though regular in form. Ward v. Weaver (Tex. Com. App.) 34 S.W.(2d) 1093; Robertson v. Vernon (Tex. Com. App.) 12 S.W.(2d) 991; Wheelock v. Cavitt, 91 Tex. 679, 45 S. W. 796, 66 Am. St. Rep. 920; Lummus v. Alma State Bank (Tex. Civ. App.) 4 S.W.(2d) 195; Yaseen v. Green (Tex. Civ. App.) 140 S. W. 824.

█ The fact of an appearance or not before the officer for the purpose of acknowledging, when disputed, is an issue for the jury.

██ We are also of opinion that there was error, as complained of, in the submission of the issue of duress and coercion. The basis of the issue of duress and coercion as made by the pleadings was a threat to tear up the deed. In addition to the submission of that issue, there was also one submitted not made by the pleadings, namely, a threat to withhold such deed. This could be treated as immaterial but for the fact that in special issue No. 7, which was necessary to make the finding as to a threat to destroy the deed effective, the jury were asked to find whether or not Mary B. Baber was induced to sign the agreement by means of a threat to destroy "or withhold from Mary B. Baber," the deed, etc. It is apparent that the issue was not only duplicitous as urged by appellants, but the affirmative answer of the jury may have been solely upon a finding that the threat to withhold the deed induced the signing of the instrument, an issue not made by the pleadings. In other words, the jury may have found as they did, and at the same time have been of opinion that the threat to destroy the deed did not induce the signing of the mineral agreement —the only basis in the pleading upon which plaintiffs claimed to be coerced.

Because of the errors mentioned, it is our opinion that the judgment of the court should be reversed and the cause remanded, and it is accordingly so ordered.